This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**WRONGFUL DEATH ESTATE OF NATIVIDAD ARCHULETA, deceased, by SINFER ARCHULETA, personal representative,**

     Plaintiff-Appellant,

v.                           **No. 31,950**

**THI OF NEW MEXICO, LLC, THI OF BALTIMORE, INC., FUNDAMENTAL ADMINISTRATIVE SERVICES, LLC, and FUNDAMENTAL CLINICAL CONSULTING, LLC,**

     Defendants-Appellees,

and

**THI OF NEW MEXICO AT VIDA ENCANTADA, ABE BRIARWOOD CORP., and SHARON INOUE,**

     Defendants.

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Eugenio Mathis, District Judge**

Harvey Law Firm

Dusti D. Harvey
Jennifer J. Foote
Albuquerque, NM

Sorey Law Firm
R. Daniel Sorey
Longview, TX

for Appellant

Proctor & Associates, P.C.
Lori D. Proctor
Houston, TX

for Appellee THI of New Mexico, LLC

The Simons Firm, LLP
Faith Kalman Reyes
Santa Fe, NM

for Appellee THI of Baltimore, Inc.

Brunner Quinn
Rick L. Brunner
Patrick M. Quinn
Columbus, OH

for Appellees Fundamental Administrative Services, LLC and Fundamental
Clinical Consulting, LLC

**MEMORANDUM OPINION**

**SUTIN, Judge.**

{1}     Following Natividad Archuleta's death, her estate, acting through its personal representative, Sinfer Archuleta (Plaintiff), sued five related entities for damages

2

under joint venture and direct liability theories premised on the allegation that the decedent's death resulted from neglectful and abusive treatment during her residency at one of the entities, a Las Vegas, New Mexico nursing home. The district court granted summary judgments in favor of four of the entities, leaving for trial only Plaintiff's claims against the nursing home. Plaintiff appeals.

{2}     We conclude that the court erred by granting summary judgments in favor of the four defendant entities, having first deprived Plaintiff of discovery that may well have supported her claims and striking Plaintiff's expert—whose testimony may have explained the practical meaning of Plaintiff's evidence had discovery been granted. We reverse the court's discovery rulings and its order striking Plaintiff's expert. In tandem with our reversal as to Plaintiff's discovery and expert, we also reverse the court's summary judgments as to direct liability and joint venture.

**GENERAL BACKGROUND**

{3}     Plaintiff claimed wrongful death, negligence, negligence per se, misrepresentation, unfair trade practices, and punitive damages against a number of related Delaware limited liability companies and one corporate entity. Defendants who are Appellees in this appeal are: Fundamental Administrative Services, LLC (Fundamental Administrative); Fundamental Clinical Consulting, LLC (Fundamental Clinical); THI of New Mexico, LLC (THI New Mexico); and THI of Baltimore, Inc.

(THI Baltimore).  We refer to these four entities collectively as "Defendants." Fundamental Administrative and Fundamental Clinical, when referenced together, are hereinafter "Fundamental Defendants"; and THI New Mexico and THI Baltimore, when referenced together, are hereinafter "THI Defendants."  The nursing home at the center of the case, THI of New Mexico at Vida Encantada, LLC (Vida), is not a party in this appeal.

{4}     At all relevant times, THI New Mexico was the sole non-managing member[1] of Vida.  THI Baltimore is the sole managing member of THI New Mexico, and the sole non-managing member of Fundamental Clinical.  Fundamental Clinical provided consulting services to Vida pursuant to a "Clinical Support Agreement."  And Fundamental Administrative provided various contracted-for services to Vida pursuant to an "Administrative Support Agreement."  Fundamental Long-Term Care Holdings, LLC, originally one of the defendants in this case, is the sole shareholder of THI Baltimore and the sole member of Fundamental Administrative.  Fundamental Long-Term Care Holdings, LLC was dismissed as a party in this lawsuit by the district court for lack of personal jurisdiction.  Fundamental Administrative provided legal

---

[1]   Limited liability company law uses the term "member" to designate a person who is an owner of the limited liability company.  Carter G. Bishop & Daniel S. Kleinberger, *Limited Liability Companies:  Tax and Business Law* ¶ 5.04 (2012).

4

and litigation support services to THI Defendants and to Fundamental Administrative. Fundamental Administrative also provided accounting services to THI Baltimore and to Fundamental Clinical.

{5} Plaintiff alleged that during the decedent's residency at Vida the decedent suffered injuries, including weight loss, dehydration, and pressure sores. Plaintiff further alleged that the decedent was hospitalized as a result of her harm and injuries and that, owing to her deteriorated state of health resulting from Vida's maltreatment, she died.

{6} Plaintiff claimed that Defendants and each of them (each Defendant), among themselves and also together with Vida, were engaged in a joint venture, and as such, each Defendant's acts and omissions in regard to the operation of Vida and the decedent's residency were imputable to all other Defendants jointly and severally. In addition, Plaintiff alleged that each Defendant was directly, individually liable. The crux of Plaintiff's complaint was that Defendants individually and as part of a joint venture underfunded Vida, limited Vida's staff and supplies, and failed to remedy known safety issues, leading to the decedent's injuries.

{7} After Plaintiff was essentially denied much of her discovery on the ground that her motions to compel discovery and depositions were not timely, and shortly before the trial setting, Fundamental Administrative and Fundamental Clinical (jointly) and

5

THI New Mexico and THI Baltimore (separately) filed motions for partial summary judgment as to Plaintiff's direct liability claims against them arguing, essentially, that because they owed no duty of care to the decedent, Plaintiff's claims against them failed as a matter of law. THI Baltimore and Fundamental Defendants also argued that even if they had a duty, there was no breach or causation as a matter of law. Additionally, Defendants filed a joint motion for partial summary judgment as to Plaintiff's joint venture claim against them, arguing, among other things, that undisputed evidence did not support Plaintiff's claim. The district court granted all of the motions for partial summary judgment.

{8}     The district court did not indicate on what undisputed facts it relied in granting the partial summary judgments, nor did it recite its reasons either verbally or in its orders supporting its orders of partial summary judgment other than the language in Rule 1-056(C) NMRA. *See Garrett v. Nissen Corp.*, 1972-NMSC-046, ¶¶ 11-12, 84 N.M. 16, 498 P.2d 1359 (overruling the statement in *Wilson v. Albuquerque Board of Realtors*, 1970-NMSC-096, ¶ 14, 81 N.M. 657, 472 P.2d 371, that in "cases where the reason for the summary judgment is not otherwise clearly apparent from the record, the trial court should state its reasons for granting it in a separate opinion or

in a recital in the judgment" (internal quotation marks and citation omitted))[2], *overruled on other grounds by Klopp v. Wackenhut Corp.*, 1992-NMSC-008, 113 N.M. 153, 824 P.2d 293. Along with her attack on the district court's orders of summary judgment, Plaintiff contends on appeal that the court abused its discretion by denying certain discovery that would have helped to illuminate her claims and by striking her expert.

{9} The case lasted 856 days from the complaint to the final appealable order. The record consists of over 3,000 pages. The case was not tried, but was decided on summary judgment. Discovery was tortuous. "The remains of the day"[3] leave this

---

[2] In the panel's view, the present case before this Court is precisely the type of case calling for application of the *Wilson* precedential wisdom. Were it not for the *Garrett* ruling, which, unfortunately, has survived to the present day, the panel would, without further analysis, remand this case to the district court with instructions to recite the undisputed facts on which it granted the summary judgments, to explain why the facts presented by Plaintiff failed to create *any* genuine issue of material fact and to state any other reasons underlying granting the motions. Particularly in complex summary judgment proceedings, and even more so where the parties do not clearly and carefully state and argue the undisputed and disputed facts, and do not obtain rulings on whether presented evidence should be disregarded, district courts should be required to clearly and carefully state on what undisputed material facts the court was relying and the particular rationales and reasons for their granting or denying summary judgment. That duty is not the sole duty of appellate courts. Both courts have the duty to provide the parties, in an expressed, transparent, and principled manner, the basis on which a summary judgment is supported.

[3] Title of a novel, *The Remains of the Day*, by Kazuo Ishiguro (Faber and Faber 1989).

Court with the unenviable and disconcerting task of arriving at a sound, principled result. Discovery matters and summary judgment determinations need not be so complicated at the trial and appellate levels. Counsel must spend the time, care, and resources necessary to timely, fairly, and professionally resolve discovery issues no matter how complex and difficult the case. Courts that fail to carefully, timely, and actively control the complex discovery and their dockets and make timely and transparent rulings are accomplices to a bewildering nightmare record on appeal. Based on our analyses that follow, we conclude that the court abused its discretion in denying Plaintiff's discovery and erred in granting Defendants' motions for partial summary judgment, and we reverse and remand the case to the district court.

**{10}** We do so in a memorandum opinion because the manner in which this case was handled spoils any precedential value this case might otherwise have had. We give the benefit of the doubt to Plaintiff as should appear evident in this Opinion. *See Spencer v. Health Force, Inc.*, 2005-NMSC-002, ¶ 7, 137 N.M. 64, 107 P.3d 504 (stating that an appellate court must view "the facts in a light most favorable to the party opposing the motion and draw all reasonable inferences in support of a trial on the merits" (alteration, internal quotation marks, and citation omitted)).

**DISCUSSION**

**I.    Discovery and Plaintiff's Expert**

{11}    We begin with a discussion of Plaintiff's second point on appeal, which is that the district court abused its discretion when it denied her essential discovery and struck her expert witness. Surprisingly, and disappointingly, her forty-eight-page brief in chief devotes a total of approximately two pages to this point. After stating that she unsuccessfully attempted to obtain discovery and was required to seek court assistance to compel discovery, Plaintiff states that the court denied "the bulk of [her] requested discovery which would have shed more light on the exact nature of the relationship between the parties, and the precise roles of the individual parties in the oversight, operation[,] and management of Vida Encantada." The impropriety of which Plaintiff complains is the court's grant of summary judgments against her after denying her the ability to obtain documents, information, and depositions to support her claims and to respond to Defendants' motions for partial summary judgment. Plaintiff also complains that she was substantially prejudiced by the court's order striking her proposed financial expert, Bruce Engstrom. She argues that the court's decision to exclude Mr. Engstrom was a "drastic and unnecessary measure" and that "[w]ithout Mr. Engstrom's testimony, Plaintiff's claim for joint venture, as well as individual claims against . . . Defendants, are compromised" because Mr. Engstrom would have testified as to the complex relationships between Defendants.

9

{12}     The discovery issues lingered over a considerable period of time, and they take up a substantial portion of the record in this case.  Suffice it to say that the parties throughout and the court toward the end failed to grab discovery by the neck and force a timely disposition of the disputes.  The issue before us is whether the district court abused its discretion in denying Plaintiff's motions to compel discovery and depositions.  Dates and timing involving discovery matters, Rule 1-016 NMRA scheduling conferences and deadlines, vacation and re-setting of trial dates, and summary judgment proceedings, are material to that issue.

**A.     The Discovery Background**

{13}     We begin with a brief overview.  Plaintiff's complaint was filed on August 31, 2009.  In mid-November 2009, Defendants objected to Plaintiff's broad, extensive requests for production of documents and interrogatories that were served in September 2009.  Defendants' objections remained unresolved from mid-November 2009 until the district court ruled with respect to the issues in July 2011, a period of one year and approximately nine months interrupted only by a discovery respite during November 2010 pending attempts through mediation to "globally" settle several pending nursing home cases.  Additional discovery issues arose in late May and early June 2011 when Plaintiff served and Defendants opposed deposition notices for the depositions of certain individuals and Rule 1-030(B)(6) NMRA deposition

10

notices that required the designation of persons to testify on twenty-four separately listed matters. A short time before the trial setting in late September 2011, the court denied a substantial portion of Plaintiff's discovery requests and granted Defendants' motions for partial summary judgment.

{14}    A detailed review of dates and timing is essential when considering whether the district court abused its discretion in its discovery rulings. After Plaintiff's August 31, 2009, complaint and the beginning of the parties' discovery dispute in late 2009, the court, in March 2010, entered a Rule 1-016 scheduling order. The order set discovery and other pretrial deadlines and scheduled trial for January 31, 2011. The deadline for discovery was mid-December 2010. The January 31, 2011, trial date and the scheduled deadlines were vacated about nine months after the scheduling order based on a stipulated motion and order filed December 29, 2010, when the parties informed the court that they were unable to meet the discovery and other deadlines—no depositions, except for Plaintiff's, had as yet been taken and discovery had not been completed.

{15}    Based on Plaintiff's December 30, 2010, request for another Rule 1-016 scheduling conference, the court gave notice on January 4, 2011, of a Rule 1-016 scheduling conference to be held on March 17, 2011. Following the conference on that date, the court on March 18, 2011, entered a scheduling order setting trial for

11

September 26, 2011, a final pretrial conference for September 14, 2011, a discovery deadline of August 5, 2011, and a dispositive motions deadline of August 12, 2011.

**{16}** On March 14, 2011, just three days before the scheduling conference, Plaintiff filed a motion to compel discovery relating to her September 2009 requests for production of documents and interrogatories. Defendants responded to the motion on March 28, 2011, and Plaintiff replied on April 13, 2011. Plaintiff attached to her reply a copy of a discovery order entered by the same court in another pending case against THI Defendants, *Lesperance v. THI of New Mexico at Vida Encantada*, No. D-412-CV-2009-102. According to Plaintiff, the court in *Lesperance* granted the plaintiff's motion to compel the production of documents "in its entirety," and the court also sanctioned the defendants $1000. On April 13, 2011, Plaintiff requested a hearing on her motion to compel discovery. On May 23, 2011, the court gave notice that the motion to compel discovery would be heard on July 7, 2011. On the same day, May 23, 2011, Plaintiff noticed depositions of several named persons connected with certain Defendants. On June 7, 2011, Plaintiff noticed Rule 1-030(B)(6) depositions duces tecum. Plaintiff requested targeted Defendants to designate a deponent to testify, among other things, as to: "[t]he reason and basis for transactions between the Defendant and any other Defendant[,]" Defendants' negotiation of management and administrative service contracts, "[t]he approval of capital improvements[,]" the

oversight of Vida's administrator, "oversight of the regional director[,]" the development and approval of budgets, and the development of policies and procedures, and the process of investigating complaints or concerns regarding Vida's resident care. These discovery notices triggered Defendants' motion for a protective order filed on June 16, 2011, to which Plaintiff responded on July 6, 2011.

{17}    Plaintiff's motion to compel discovery was heard and denied on July 7, 2011. At this hearing on Plaintiff's motion to compel discovery, the court indicated that it had "read everything that's been submitted[,]" and this was supported when Plaintiff's counsel confirmed that his "appearances in front of [the court] have always been that [the court] read everything[.]"  At the start of the hearing, the court indicated its concern that there was a discovery deadline of August 5, with trial coming up. After Plaintiff's counsel opened argument, defense counsel indicated that Plaintiff's discovery request was "just like the set of discovery we've gotten in the [fifteen] other cases in which [the same law firm as the firm representing Plaintiff] is involved" and that the defense had produced and copied and redacted over 10,000 documents in the *Lesperance* case alone.  Defense counsel also reminded the court that Plaintiff's discovery request went beyond personnel files to include corporate information, documents relating to control and running of Vida, and counsel explained that although some documents had been produced, Plaintiff's discovery request was

13

generalized, overbroad, and a harassing fishing expedition. Upon Plaintiff's counsel's reminder to the court that in *Lesperance*, the same court ordered the defendants to produce personnel files of many more employees than in the present case, the court responded that *Lesperance* did not involve a motion to compel filed less than thirty days before a discovery deadline, indicating too that the court was not inclined in any way to continue the September 26, 2011, trial setting. The court further stated:

> You people told me you could try this case in September. We discussed the discovery deadline of August. Those are the dates you submitted to me. And now, . . . it looks like you haven't done anything. I know you have, obviously, but it looks like here we are wanting corporate information, financial information, incident reports, notice information, personnel files for—I take it—over 100 individuals[] and . . . with less than a month to go before you can't do any more discovery. I want to be consistent, certainly, but I'm afraid that being consistent is [going to] mean a continuance of this trial.

{18}     Plaintiff's counsel assured the court that if the discovery that Plaintiff sought was provided before the discovery deadline, Plaintiff would not ask for a continuance of trial. Plaintiff's counsel also indicated that trial was over two months away and reminded the court that in *Lesperance* the court required the defendants to produce everything and sanctioned the defendants $1000 for dilatory activity. When the court asked if the present case had not already been set for trial, Plaintiff's two attorneys erroneously indicated that the case had not before been set for trial. Plaintiff's counsel then implied that the period from the March 14, 2011, filing of the motion to compel

14

discovery to the July 7, 2011, hearing date on that motion was an impermissible delay, causing the court to explain that this was not the court's only case, the court had a busy docket, that Plaintiff's timing was bad, and that the case had already been set for trial once in January. The court then concluded:

> I'm going to deny the motion. I'm concerned with . . . the timing of the motion, and I'm concerned with counsel for . . . [P]laintiff's representation that they can't prepare for this trial without this information.

> This case was on the [c]ourt's docket . . . in January. It was stipulated to cancel [that trial setting]. And . . . even before that time, I wasn't aware that there were . . . any of these issues. And now, we have a . . . trial that's set in September, [and] a discovery deadline that's set less than a month from now.

The court also indicated that if it were to vacate the trial, the court would be unable to schedule anything for the ten days set for the trial. The court acknowledged that it thought that Plaintiff "certainly would be entitled to the information if—and I've ruled on that that way in the past . . . on similar, if not identical issues. But to be seeking the [c]ourt's intervention at this late date, I think, merits a denial of the motion." Informed about Plaintiff's separate motion to compel depositions about to be filed, the court proceeded to verbally order an expedited process to get that matter before the court, and the court approved the use of emails to keep the court informed of issues.

{19} The depositions Plaintiff sought pursuant to her July 8, 2011, motion to compel were the depositions of Sharon Inoue, Vida's administrator; Joanne Santillanes, Vida's director of nursing; Jaime Andujo, regional director of operations for Fundamental Clinical; Bradley Bennett, CEO of Fundamental Administrative; Scott Hillegass, Fundamental Clinical's regional vice president for the New Mexico district; Defendants' expert witnesses; and corporate designees for certain Defendants. Plaintiff filed a motion on July 11, 2011, asking the court to reconsider the court's July 7, 2011, denial of her motion to compel discovery.

{20} Also on July 11, 2011, the court entered an order implementing an expedited briefing schedule. On July 12, certain Defendants responded to Plaintiff's Rule 1-030(B)(6) deposition notices. On July 13, 2011, the court entered an order based on its earlier July 7, 2011, verbal ruling denying Plaintiff's motion to compel discovery. The court denied the motion for lack of timeliness. On the same date, July 13, 2011, Vida and THI New Mexico responded to Plaintiff's motion to compel depositions of named persons. On July 18, 2011, the court entered an order granting Fundamental Clinic's motion for a protective order as to the deposition of Hillegass.

{21} On July 20, Plaintiff filed a reply in connection with her motion asking the court to reconsider the court's July 7, 2011, ruling. On the same day, the court, via email, stated that it would allow the depositions of Andujo and Bennett or their

16

equivalents, that the court would deny the Rule 1-030(B)(6) depositions, and that as to Plaintiff's motion to reconsider the July 7, 2011, order the court would require Defendants to produce the personnel files of Vida's administrator, director of nursing, those who were decedent's caregivers, and any other employee witnesses that Defendants intended to call. On July 26, 2011, the court entered an order based on its earlier email rulings granting Plaintiff's motion to compel depositions as to Bennett or his equivalent and Andujo or his equivalent, and denying Plaintiff's motion to compel the Rule 1-030(B)(6) depositions.

{22}    The August 5, 2011, discovery deadline passed without any request for its extension. On August 12, 2011, Plaintiff filed a motion for summary judgment on her joint venture claims, and on the same date and on August 15, 2011, Defendants filed motions for partial summary judgment on Plaintiff's joint venture and direct liability claims. On August 16, 2011, the court entered another order in connection with Plaintiff's motion to reconsider the July 7, 2011, ruling, requiring Defendants to produce the personnel files for certain of Vida's employees. On August 22 and 24, 2011, Plaintiff responded to Defendants' motions for partial summary judgment. On September 6, 2011, Plaintiff moved for partial reconsideration of the court's ruling denying her motion to compel depositions, requesting the court to compel the

deposition of Daniel Mathis, who was the vice president for Fundamental Clinical and Andujo's "equivalent."

{23}    Beginning as early as December 2009 and January 2010, correspondence was exchanged in regard to discovery issues.  Little appears to have been resolved up to and well past the time of Plaintiff's motions to compel discovery and to compel depositions.  As of December 2010, and later in June, July, and August 2011, the parties disputed whether the deposition of Plaintiff's expert, Mr. Engstrom, should be postponed until the discovery disputes were resolved, Plaintiff's position being that Mr. Engstrom would not have much to go on until he was able to review documents and deposition testimony.  Plaintiff appears to have first offered dates and location for Mr. Engstrom's deposition on July 20, 2011, which was after the court's ruling denying her motion to compel discovery, and correspondence regarding dates and locations for Mr. Engstrom's depositions continued through at least September 7, 2011.  On September 6, 2011, Plaintiff filed the affidavit and report prepared by Mr. Engstrom, to be attached to Plaintiff's response to THI Baltimore's motion for partial summary judgment, and as exhibits to her own motion for summary judgment.  In the affidavit, Mr. Engstrom stated, among other things, that his

> work involves following the trail of money associated with a particular
> nursing home, demonstrating the profitability of the various segments of
> related party operations, the presence or absence of arms' length

18

transactions between related parties, evidence of transfer of profit by related parties from the licensee of the nursing home and determining the net worth of various defendants. [And further involves] look[ing] for evidence of exertion of control by related parties through analysis of contractual agreements, budgets, and various financial documents.

The report purported to show, among other things, the corporate structure and financial relationships between Defendants and Vida. On September 13, 2011, Defendants filed a motion to strike Mr. Engstrom and to exclude his testimony. Defendants asserted, among other things, that they had "been denied a meaningful opportunity to examine" the bases for his testimony owing to Plaintiff's failure "to disclose any more than the overly generic subject matter, substance, nature, extent of or factual basis for Mr. Engstrom's potential testimony" and that Plaintiff had failed to give them "a meaningful opportunity to depose" him. On September 13, 2011, Plaintiff filed a motion for sanctions against Defendants THI New Mexico and Vida for discovery abuse. On September 14, 2011, the court held the scheduled final pretrial conference. At the hearing, the court indicated that from emails that had crossed its desk it did not appear that the case had much chance of settlement. The court discussed whether the jury would consist of six or twelve jurors, the fact that 100 jurors had been summoned for trial and other jury matters such as seating and questionnaires, witness and exhibit lists and identification, jury instructions, and the status of several pending motions. The court acknowledged that it had not had the

19

time to review the pending motions and indicated that there would not be time before trial to have hearings on the motions and that the motions would be addressed quickly and decided on the submissions without oral argument.

{24}     Plaintiff responded on September 19, 2011, to Defendants' motion to strike Mr. Engstrom and exclude his testimony, setting out correspondence relating to making Mr. Engstrom available.  On the same day, September 19, 2011, the court via email notified the parties that it was granting Defendants' motion for partial summary judgment on Plaintiff's joint venture claims.  In another email on September 20, 2011, the court informed the parties that it would strike Mr. Engstrom as a witness because he was offered only to support Plaintiff's joint venture claims and because Defendants had been deprived of a meaningful opportunity to take Mr. Engstrom's deposition and to explore the bases for his opinions.

{25}     On September 26, 2011, the court entered an order based on its email rulings granting Defendants' motion to strike Mr. Engstrom and exclude his testimony.  In the order, the court found that "Defendants [had] been deprived by Plaintiff of a meaningful opportunity to depose Mr. Engstrom and to fully explore the basis of his opinions in this matter," and the court ordered that Mr. Engstrom was excluded as a witness, and would "not be permitted to testify at the trial or any other proceedings in this matter."  Also on September 26, 2011, the court entered orders granting

Defendants' motions for partial summary judgment on Plaintiff's joint venture and direct liability claims. There exists no indication that the court considered any part of Mr. Engstrom's affidavit and report in connection with the summary judgment proceedings. Left for trial were solely Plaintiff's claims against Vida. Trial on those claims scheduled for September 26 was continued.

**B.    The Discovery Analysis**

{26}    The critical issues here are the district court's denials of Plaintiff's motions to compel discovery and depositions in July and August 2011 followed by its grant of Defendants' motions for partial summary judgment on September 26, 2011. A thin line separates determinations as to whether the district court abused or did not abuse its discretion in denying a very substantial part of Plaintiff's discovery before granting the partial summary judgments on Plaintiff's joint venture and direct liability claims against Defendants. The denial essentially foreclosed Plaintiff's ability to effectively defend against Defendants' summary judgment motions. On the one hand, it appears that the court could have faulted Plaintiff on various grounds, including delay in actively, carefully, and diligently pursuing court relief and perhaps failing to call for personal meetings with the defense to attempt to resolve some, most, or all of the dispute. On the other hand, once the court was aware of the discovery issues, the court could have assumed an immediate and proactive role in prioritizing, setting, and

21

extending deadlines if need be and also to personally assist the parties in getting to a timely resolution of the discovery issues in a manner that would have permitted Plaintiff to obtain the discovery essential to defend against the summary judgment motions.

{27}    More particularly, the court could have considered the following.  The record does not indicate that Plaintiff made meaningful efforts early on and throughout the proceedings to meet personally with opposing counsel to attempt to resolve discovery differences; Plaintiff did not attempt early on and throughout the proceedings to make the court aware of her discovery difficulties and to request the court's assistance in requiring the parties to meet and attempt to resolve discovery disputes on a timely basis; Plaintiff did not file and actually pursue a motion to compel discovery considerably earlier than March 14, 2011, although, as early as January 27, 2010, Plaintiff's counsel stated in a letter to Defendants' counsel that she was going to file a motion to compel if the discovery issues were not resolved, and on March 4, 2010, Plaintiff again indicated she was filing a motion to compel; Plaintiff did not describe a critical need to expedite a hearing on her March 14, 2011, motion to compel and waited until April 13, 2011, to request a hearing on the motion; notwithstanding the denial of her discovery before the motions for partial summary judgment were filed, when those motions were filed, Plaintiff did not specifically request under Rule 1-

22

056(F) any postponement of briefing and decisions on the summary judgment motions, nor did she request a continuance of the September 26, 2011, trial date offering detailed examples and specific reasons why certain denied discovery would enhance her opposition to the motions by creating genuine issues of material fact; Plaintiff did not show the court specifically and adequately how discovery might be limited or how the discovery was critical on particular issues, and further show, were discovery to be allowed, how the parties could be ready for trial were the September 26, 2011, trial date not postponed; and Plaintiff did not show how, in allowing the discovery, the court's docket would not be substantially adversely affected and would not prejudice or significantly burden Defendants.

{28}     On appeal, Plaintiff devotes only two pages to the denial of discovery, found at the end of her forty-eight-page brief in chief. Plaintiff nowhere in those two pages specifically explains how or why the court abused its discretion in denying discovery. Plaintiff relies generally on *Marchiondo v. Brown*, 1982-NMSC-076, 98 N.M. 394, 649 P.2d 462, which held that the court erred in entering summary judgment when the plaintiff had been denied the opportunity to discover certain facts. Plaintiff also generally relies on *Pincheira v. Allstate Insurance Co.*, 2008-NMSC-049, ¶ 21, 144 N.M. 601, 190 P.3d 322, in arguing that the court here failed to allow "liberal pretrial discovery" and "a fair contest with the basic issues and facts disclosed to the fullest

practicable extent." (Emphasis, internal quotation marks, and citation omitted.) Plaintiff does not explain in what particular manner the district court's ruling on her motion to compel discovery, based on the timing of it, and based on the court's obvious surprise that it had not been made aware of any discovery disputes, constituted an abuse of discretion. Nor does Plaintiff explain in the brief why the denial of certain depositions was an abuse of discretion.

{29} The court, however, appears to have also missed the boat. In the July 7, 2011, hearing, the court believed that Plaintiff was entitled to discovery. And after hearing Plaintiff's counsel's argument as to Defendants' obstructive tactics, the court made it clear that it would sanction parties that contributed to the discovery standstill, but that it was not addressing the issue in the hearing at hand. Yet, the court's rulings denuded Plaintiff's claims against Defendants, rendering Plaintiff, as shown by the court's rulings on Defendants' partial summary judgment motions, at substantial risk of adverse summary judgments. Furthermore, although the court was concerned about the impending discovery deadline and trial date, the court nevertheless did grant some of Plaintiff's requested document discovery and depositions. Nothing in the record indicates that the court considered taking action that could have provided Plaintiff a reasonable opportunity to defend against Defendants' motions for partial summary judgment.

24

{30}   In discovery circumstances in which the court has discretion to dismiss an action as a sanction for abuse of or default in discovery, the court has an obligation to arrive at lesser sanctions if possible. *See, e.g.*, *State v. Harper*, 2011-NMSC-044, ¶¶ 16, 19-20, 150 N.M. 745, 266 P.3d 25 (stating that "[t]he trial court . . . should seek to apply sanctions that affect the evidence at trial and the merits of the case as little as possible"; further that "even when a party has acted with a high degree of culpability, the severe sanctions of dismissal or the exclusion of key witnesses are only proper where the opposing party suffered tangible prejudice"; and that "when discovery has been produced late, prejudice does not accrue unless the evidence is material and the disclosure is so late that it undermines the defendant's preparation for trial" (omission in original) (internal quotation marks and citation omitted)); *Gonzales v. Surgidev Corp.*, 1995-NMSC-047, ¶¶ 32-33, 120 N.M. 151, 899 P.2d 594 (stating that the court should not impose sanctions more stern than is reasonably necessary and that meaningful alternatives should be reasonably explored); *Weiss v. THI of N.M. at Valle Norte LLC*, 2013-NMCA-054, ¶¶ 19, 21, 23, 301 P.3d 875 (affirming a less severe monetary sanction imposed under the court's inherent powers); *Lopez v. Wal-Mart Stores, Inc.*, 1989-NMCA-013, ¶ 15, 108 N.M. 259, 771 P.2d 192 ("Generally, causes should be tried on their merits; depriving parties of their day in court is a penalty that should be avoided in the absence of impeding administration or perpetuating injustice.

25

Dismissal is a sanction of last resort to be used only in extreme circumstances." (citation omitted)).

{31}  Here, even though Plaintiff did not outright request a Rule 1-056(F) stay of summary judgment or a vacation of the trial date combined specifically with a request for reconsideration of the court's discovery rulings so as to allow her discovery in order to resist the motions for partial summary judgment, the court clearly understood Plaintiff's predicament. From all appearances, the court could have chosen to actively enter the fray and could have managed its docket in order to get the discovery issues resolved and the case on track for fair and full summary judgment adjudication or trial. The court could have attempted to keep this case on track by being personally involved in allowing and limiting discovery, extending and resetting firm, mandatory, even expedited discovery deadlines, and extending the trial date if need be. Nowhere did the court indicate that by attempting to actively resolve the discovery disputes and extending deadlines its docket or court administration would have been so substantially and detrimentally disrupted as to justify, in effect, sanctioning Plaintiff by, in effect, dismissing her claims. Nor did the court analyze the extent, if any, that Defendants would have been prejudiced or overly burdened were the court to rule differently. Certainly, the court, if personally involved, could have ascertained the extent, if any, to which Plaintiff's requests were unreasonably or unthinkingly

26

overbroad or overreaching, or to which Defendants engaged in improper obstructive behavior.

{32} Simply put, this case should not be in the position it is in at this appellate stage. We should not be in the position of weighing fault and abuse of discretion in this case. The adversary process need not and should not work in this way. We do not absolve Defendants here of fault. In discovery disputes such as this, while plaintiffs have the burden to move their discovery along, gamesmanship by defendants often enters, increasing cost and extending time. The defense has a professional obligation to assist in getting discovery disputes resolved. In Plaintiff's view, Defendants' responses to discovery were incomplete and not comprehensive, and Defendants "willfully and concertedly withheld discoverable information[.]" Defendants, as easily as plaintiffs, can seek personal conferences to get to the nitty-gritty of the discovery requests and to resolve disputes and move the case along. If counsel representing each side cannot personally, in a timely and professional manner, seeking the court's personal assistance, if necessary, get through the discovery process, then comes the time, with adequate forewarning, for court sanction of recalcitrant, unreasonable, or unprofessional conduct of counsel and parties. District courts have sanctioning power. With that power comes the duty first, in appropriate cases, to act to resolve discovery disputes.

{33}    We fully understand the need for district courts to control their own dockets and to administer their court. Nevertheless, when, based principally or only on timing and through adverse discovery rulings, the court deprives a party of the reasonable opportunity to resist summary judgment or prepare for trial, the court should fully and transparently substantiate on the record the substantial and deleterious impediment to and effect on its docket and the impermissible prejudice to and burden on the party benefitting from a court's ruling that essentially and in effect dismisses a party's claims. The court had the discretion and inherent sanctioning power short of gross, outright denial of a major part of Plaintiff's discovery. A court's frustration with a party should not override rational and incisive cures for untimeliness or recalcitrance in a discovery standstill short of eroding a party's case to the point of laying it bare. We fail to see why the court in this case could not have moved this case to a different, more palatable level and closure in regard to discovery and summary judgment adjudication. Alternatively, the court should have better explained why less drastic alternatives were out of the question.

{34}    There exists a presumption in favor of permitting pretrial discovery. *See Marchiondo*, 1982-NMSC-076, ¶ 13. And a plaintiff's right "to examine a defendant fully and exhaustively . . . is fundamental to our system of jurisprudence." *Id.* Although the district court has discretion to reasonably limit discovery, *Doe v. Roman*

28

*Catholic Diocese of Boise, Inc.*, 1996-NMCA-057, ¶ 21, 121 N.M. 738, 918 P.2d 17, discovery is generally permitted "where relevant facts are in the exclusive control of the opposing party[.]" *Marchiondo*, 1982-NMSC-076, ¶ 16; *see Am. Nat'l Prop. & Cas. Co. v. Cleveland*, 2013-NMCA-013, ¶ 26, 293 P.3d 954 (recognizing that "[a]n abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case" or if its ruling is "clearly untenable or not justified by reason" (internal quotation marks and citation omitted)); *see also Marchiondo*, 1982-NMSC-076, ¶ 22 (holding that the district court erred by granting summary judgment against a party that had been denied discovery of facts essential to its claim). Last, but certainly not least, lest we forget, a party is entitled to the discovery of information that, while not itself necessarily admissible evidence, "appears reasonably calculated to lead to the discovery of admissible evidence." Rule 1-026(B)(1) NMRA.

**C.    Conclusions**

{35}    We reverse the district court's order denying Plaintiff's motion to compel discovery and the order denying Plaintiff's motion to compel depositions of individually named deponents and to compel the Rule 1-030(B)(6) depositions of THI Baltimore and Fundamental Defendants. On remand, counsel for the parties are to professionally, in good faith, and with due diligence attempt to resolve their discovery

differences. They should particularly hone in on what discovery Plaintiff fairly requires under our discovery rules for her opposition to any further motions for partial summary judgment and for trial. We see no reason why the court cannot exercise its sound discretion, including sanctioning power, if, after adequate time is spent in diligent attempts by the parties and active engagement of the court to resolve discovery differences, one party's or the other's behavior violates reasonable or professional bounds. The bases for the court's rulings on discovery and any exercise of its sanctioning power must be transparent.

{36} Further, Plaintiff's opportunity to prove her joint venture and direct liability claims depended on her ability to demonstrate the extent to which THI New Mexico and THI Baltimore controlled Vida's operation. The intricacies of complex corporate banking, finance, and management relationships and structures and the manner in or extent to which THI New Mexico or THI Baltimore exercised control over Vida's finances by employing such structures are appropriate topics for expert testimony. *See Mott v. Sun Country Garden Prods.*, 1995-NMCA-066, ¶ 34, 120 N.M. 261, 901 P.2d 192 (recognizing that "expert testimony [is] admissible in cases where [the] average juror would have no basis for evaluating the evidence without the assistance of an expert" (internal quotation marks and citation omitted)). Assuming, without deciding, that Mr. Engstrom was qualified to testify regarding the various

relationships among Defendants and Vida, and was able to rely on discovery that Plaintiff was pursuing, the exclusion of Mr. Engstrom's testimony would run contrary to the facts and circumstances of this case. *See Am. Nat'l Prop. & Cas.*, 2013-NMCA-013, ¶ 26 (stating the abuse of discretion standard). Thus, we reverse the court's order striking Mr. Engstrom and precluding his testimony. On remand, after discovery disputes are appropriately resolved, Plaintiff shall grant Defendants a meaningful opportunity to depose Mr. Engstrom and to explore the bases of his anticipated testimony as shown by his report. Should the court determine that, following appropriate discovery, Mr. Engstrom will not be permitted to testify or that aspects of his testimony will not be admitted, the court shall detail the rationale underlying its rulings.

## II.    Summary Judgment

### A.    Standards

{37}    "A defendant seeking summary judgment . . . bears the initial burden of negating at least one of the essential elements upon which the plaintiff's claims are grounded[,]" and "[o]nce such a showing is made, the burden shifts to the plaintiff to come forward with admissible evidence to establish each required element of the claim." *Bassett v. Sheehan*, 2008-NMCA-072, ¶ 5, 144 N.M. 178, 184 P.3d 1072 (omission in original) (internal quotation marks and citations omitted)). "Summary

judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582.

{38} Plaintiff's claims were to be tested based on whether, on undisputed facts, Defendants were entitled to judgment as a matter of law, or whether, if the facts were not undisputed, a genuine issue of material fact existed precluding summary judgment. *See Bd. of Cnty. Comm'rs v. Risk Mgmt. Div.*, 1995-NMSC-046, ¶ 4, 120 N.M. 178, 899 P.2d 1132 ("If the facts are undisputed and only a legal interpretation of the facts remains, summary judgment is the appropriate remedy."); *Thompson v. Fahey*, 1980-NMSC-013, ¶ 6, 94 N.M. 35, 607 P.2d 122 ("So long as one issue of material fact exists [summary judgment] may not be properly granted."). "Summary judgment is an extreme remedy that should be imposed with caution." *Ocana v. Am. Furniture Co.*, 2004-NMSC-018, ¶ 22, 135 N.M. 539, 91 P.3d 58. "If there is the slightest doubt as to the existence of material factual issues, summary judgment should be denied." *Garcia-Montoya v. State Treasurer's Office*, 2001-NMSC-003, ¶ 7, 130 N.M. 25, 16 P.3d 1084 (internal quotation marks and citation omitted). "We review de novo an order granting . . . summary judgment." *Amethyst Land Co. v. Terhune*, 2013-NMCA-059, ¶ 28, 304 P.3d 434.

**B.     Plaintiff's Joint Venture Claims**

{39} "A joint venture is formed when the parties agree to combine their money, property[,] or time for conducting a particular business venture and agree to share jointly in profits and losses, with the right of mutual control over the business enterprise or over the property." *Quirico v. Lopez*, 1987-NMSC-070, ¶ 9, 106 N.M. 169, 740 P.2d 1153. The parties' agreement to form a joint venture may be inferred from the parties' "acts in connection with the entire transaction[,]" the agreement need not be in writing. *Id.* ¶¶ 9-10.

{40} It is not entirely clear whether Plaintiff was asserting one joint venture among the four Defendants, of which Vida was the business enterprise, or one joint venture among the four Defendants and Vida. There appears to be a complete insufficiency of evidence on which, under any state of the facts, disputed or undisputed, Plaintiff could overcome summary judgment in regard to either iteration of a joint venture theory. That is, under either joint venture theory, Plaintiff did not present evidence that prevented Defendants from negating all elements of joint venture. We explain.

{41} Plaintiff sued all five entities, Defendants and Vida, based on a view that "THI/Fundamental [had] created a multi-layered ownership and operation structure, with the explicit purpose of obfuscating ownership and attempting to shirk liability" and that "it was the actions of the companies, both individually and as part of the joint venture itself—the under[-]funding, the limitations on budgeting staff and supplies,

33

and the failure to remedy known safety issues—that proximately caused the injury to [the decedent]." Plaintiff contends that the underlying THI/Fundamental "complex corporate structure" meets the elements of a joint venture, pursuant to which Defendants are jointly and severally liable for the venture's negligent acts under the same principles that apply to partnerships.

**1.     Joint Venture:  Defendants' Jurisdiction and Liability Shield Arguments**

**a.     Jurisdictional (Defective Appeal) Challenge**

{42}    Defendants argue that because a copy of the joint venture dismissal order was not attached to Plaintiff's notice of appeal, she failed to properly seek appellate review of that order.  Defendants also argue that Plaintiff is procedurally barred from appealing the district court's dismissal of her joint venture claim because she failed to timely appeal that order.  A review of the relevant time-line and of our substantive law on the matter leads us to reject these arguments.

{43}    Over the course of two days, and on the eve of trial, the district court issued its four summary judgment orders.  On September 26, 2011, the date set for trial, the court granted partial summary judgments as to joint venture and also entered summary judgment in favor of Fundamental Defendants and THI Baltimore as to direct liability. On September 27, 2011, the district court entered summary judgment in favor of THI New Mexico as to direct liability.  On October 11, 2011, pursuant to Rule 1-059(E)

34

NMRA and Rule 1-060(B)(6) NMRA, Plaintiff filed two motions, one addressing THI Defendants and one addressing Fundamental Defendants, asking the court to alter or amend the orders granting summary judgment as to the direct liability claims against them. *See* Rule 1-059(E) ("A motion to alter or amend the judgment shall be served not later than ten . . . days after entry of the judgment."); Rule 1-060(B)(6) (permitting the district court to relieve a party from a final judgment for any "reason justifying relief from the operation of the judgment"). On January 4, 2012, the district court denied the motions.

{44} On January 27, 2012, Plaintiff filed a notice of appeal stating that she was appealing from the district court's "September 26, 2011[, o]rders granting the [m]otions for [s]ummary [j]udgment of Defendants [THI New Mexico], [THI Baltimore], Fundamental Administrative . . . , and Fundamental Clinical[.]" Attached to Plaintiff's notice of appeal, were the court's orders granting summary judgment on Plaintiff's direct liability claims against Defendants individually and the court's orders denying Plaintiff's motion to alter or amend, but she did not attach the court's order dismissing Plaintiff's joint venture claim or otherwise intimate that her notice of appeal encompassed the court's summary judgments as to joint venture.

{45} Defendants correctly argue that Plaintiff's failure to attach a copy of the joint venture dismissal order to her notice of appeal constitutes a violation of Rule 12-

35

202(C) NMRA. *See id.* ("A copy of the judgment or order appealed from, showing the date of the judgment or order, shall be attached to the notice of appeal."). While we do not condone Plaintiff's failure to comply with Rule 12-202(C), nevertheless, in accord with our general policy of reaching appeals on their merits, rather than dismissing them on technical grounds, we conclude that our review is not barred by that defect. *See Wakeland v. N.M. Dep't of Workforce Solutions*, 2012-NMCA-021, ¶ 7, 274 P.3d 766 (noting that this Court has adopted a "liberal approach" to the interpretation of the Rules of Appellate Procedure "in order to further a policy of hearing appeals on their merits rather than dismissing them on technical grounds"); *Martinez v. Martinez*, 1984-NMCA-026, ¶ 3, 101 N.M. 493, 684 P.2d 1158 (stating that this Court had jurisdiction over an appeal notwithstanding the appellant's failure to attach a copy of the judgment to the notice of appeal). In addition to adhering to our general policy of reaching the merits of appeals, our decision to consider Plaintiff's joint venture appeal is also informed by the particular circumstances of this case.

{46} First, we note that Plaintiff's notice of appeal referenced the district court's "September 26, 2011" summary judgment orders, of which the court's summary judgment as to joint venture was one. Further, Plaintiff's complaint and her responses to Defendants' summary judgment motions, including those addressing direct liability,

36

do not clearly delineate between the direct liability and joint venture theories in terms of allegations or proof. Thus, we believe that any appeal involving the direct liability claims necessarily encompasses theories and proof in regard to joint venture, rendering it a likely and important basis for Plaintiff's appeal.

**{47}** Moreover, Defendants' claim that Plaintiff's appeal from the court's order dismissing her joint venture claim was not timely is unavailing. Plaintiff's appeal was taken within thirty days of the court's January 4, 2012, order, on Plaintiff's motions to alter or amend the orders granting judgment. As such, the appeal was timely as to all of her claims. *See* Rule 12-201(D) NMRA ("If a party timely files a motion pursuant to . . . Rule 1-059 . . ., the full time prescribed . . . for the filing of the notice of appeal shall commence to run and be computed from the entry of an order expressly disposing of the motion."); *see also* Rule 1-054(B)(1) NMRA (stating that "when more than one claim for relief is presented in an action, . . . the court may enter a final judgment as to one or more but fewer than all of the claims" but generally, any order adjudicating "fewer than all the claims shall not terminate the action as to any of the claims" and the court may revise its judgment "any time before the entry of judgment adjudicating all the claims"). For all of the foregoing reasons, we reject Defendants' challenge to our jurisdiction over this appeal.

**b.      Liability Shield Argument**

37

{48} Defendants argue that any theory of liability, including a joint venture theory, that is premised solely on THI Baltimore's status as the sole managing member of THI New Mexico or THI New Mexico's status as the sole non-managing member of Vida fails because limited liability companies' members are generally shielded from liability for the company's tortious acts. Defendants misconstrue Plaintiff's argument in regard to joint venture. Plaintiff's joint venture theory does not attempt to hold THI New Mexico liable based on its member status relative to Vida, nor does it attempt to hold THI Baltimore liable based on its member or owner status relative to THI New Mexico. Rather, Plaintiff's joint venture claim is premised on a theory that THI New Mexico, THI Baltimore, and Vida in their status and capacity as individual, separate, limited liability companies, as opposed to their status and capacity as members or owners of other entities, agreed to participate as joint venturers in the operation of Vida. The question whether they are liable based "solely" on their status as limited liability company members is irrelevant as to Plaintiff's joint venture claim. Accordingly, we reject, as inapplicable in this context, Defendants' arguments and authorities proffered to show why membership in a limited liability company, by itself, does not give rise to liability.[4]

---

[4] *See, e.g.*, *Leber v. Universal Music & Video Distribution, Inc.*, 225 F. Supp. 2d 928, 937 (S.D. Ill. 2002) (rejecting the plaintiff's "assertion that a limited

38

## 2. Joint Venture: Merits

### a. Defendants' Joint Venture Summary Judgment Evidence

{49} In seeking summary judgment as to Plaintiff's joint venture claim, Defendants were required to negate at least one of the three joint venture elements. *See Blauwkamp v. Univ. of N.M. Hosp.*, 1992-NMCA-048, ¶ 14, 114 N.M. 228, 836 P.2d 1249. To that end, Defendants provided the district court with sworn declarations and an affidavit by Christine Zack, in-house counsel for Fundamental Administrative, and sworn affidavits by Kenneth Tabler, Fundamental Defendants' accountant, as well as the vice president, secretary, and treasurer of THI Baltimore.

---

liability company . . . is liable for the contractual obligations of its corporate members or that a fellow limited liability company member . . . is liable for the contractual obligations of another member"); *United States ex rel. DeKort v. Integrated Coast Guard Sys.*, 705 F. Supp. 2d 519, 544 (N.D. Tex. 2010) (rejecting the plaintiff's attempt to use a joint venture theory to hold members of a limited liability company liable for the company's tortious acts based exclusively on the members' public representations that they were participating in a joint venture); *United States v. RG Steel Wheeling, LLC*, No. 5:12-CV-19, 2012 WL 3647717, at *1, *3 (N.D. W. Va. Aug. 23, 2012) (rejecting the plaintiff's attempt to hold the defendant liable for a limited liability company's tortious conduct "based solely on the fact that [the defendant was] part-owner of" the limited liability company); *Brew City Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App. 39, ¶ 13, 289 Wis. 2d 795, 714 N.W.2d 582 (stating that, under Wisconsin statutory law, "neither members of a limited liability company nor its manager may be liable in tort, for their acts or conduct as a member or manager, to third persons").

{50}     In relevant part, Ms. Zack stated the following. Vida employed its own staff, and its day-to-day operations were controlled by its administrator and its director of nursing. Pursuant to federal regulations, Vida had a governing body with the authority to hire and fire its administrator. Vida's governing body consisted of Vida's administrator, its director of nursing, "and a [r]egional [d]irector of [o]perations/[r]egional [v]ice [p]resident acting in a separate capacity from his employment with [Fundamental Clinical]." Neither THI Defendants nor Fundamental Defendants served on Vida's governing body "or otherwise acted in any capacity to operate, manage[,] or control [Vida]."

{51}     Mr. Tabler stated, in relevant part, that THI Defendants and Fundamental Defendants never combined their money, property, or time with each other or with Vida, and that they never agreed to and never did share their money or property with each other or with Vida. By stating under oath that Defendants did not agree to combine their resources for the purpose of operating Vida or agree to share jointly in Vida's profits and losses, Ms. Zack and Mr. Tabler negated two elements required to establish a joint venture. *See Quirico*, 1987-NMSC-070, ¶ 9 (stating the elements of joint venture). As such, Defendants made a prima facie showing that they were entitled to summary judgment as to Plaintiff's joint venture claim. *See S. Farm Bureau Cas. Co. v. Hiner*, 2005-NMCA-104, ¶ 9, 138 N.M. 154, 117 P.3d 960 ("A

40

defendant seeking summary judgment . . . bears the initial burden of negating at least one of the essential elements upon which the plaintiff's claims are grounded." (omission in original) (internal quotation marks and citation omitted)). As such, the burden shifted to Plaintiff to show genuine issues of material fact establishing each required element of her joint venture claim. *See Blauwkamp*, 1992-NMCA-048, ¶ 18 ("Once [the d]efendants made a prima facie showing of entitlement to summary judgment, the burden of proving the existence of genuine material factual issues shifted to [the p]laintiffs, requiring them to come forward and show by affidavits or other means, admissible evidence indicating material facts tending to establish each required element of their claims.").

**b. Plaintiff's Joint Venture Summary Judgment Evidence**

{52} In response to Defendants' motion for summary judgment as to joint venture, Plaintiff was required "to come forward with admissible evidence to establish each required element" of a joint venture agreement among the parties to the alleged joint venture. *Bassett*, 2008-NMCA-072, ¶ 5 (internal quotation marks and citation omitted). Plaintiff's evidence in this regard consisted of portions of five documents and excerpts from the deposition testimony of Sharon Inoue, Vida's administrator during part of the decedent's residency.

{53}    Plaintiff's documentary evidence included a "Nursing Facility Licensure Application" that showed that Fundamental Long-Term Care Holdings, LLC wholly owned THI Baltimore, which wholly owned THI New Mexico, which wholly owned Vida.  Plaintiff also presented portions of an "Amended and Restated Revolving Credit and Security Agreement" among Fundamental Long-Term Care Holdings, LLC, THI Baltimore, THI of Nevada II, Inc., and certain subsidiaries– including Vida, as borrowers and Capitalsource Finance LLC, the lender (the credit and security agreement).  The credit and security agreement includes a graphical depiction of a "Corporate Bank Structure" which is described as "an accurate and complete description of the cash management system maintained by [b]orrowers . . . with respect to the deposit and transfer of funds from the collection of all receivables."  It also states that "[b]orrowers shall, at all times, maintain or cause to be maintained an integrated cash management system in accordance with Section 2.5" and other provisions of the credit and security agreement; however, Section 2.5 of the document was not included in Plaintiff's documentary evidence.  Notably missing from Plaintiff's evidence in regard to the credit and security agreement was any explanation of the terms of the agreement, the nature of their effect on Defendants or Vida, or how the agreement constituted proof of a joint venture.

42

{54} Additionally, Plaintiff included portions of "support agreements" between Fundamental Defendants and Vida. The "Administrative Support Agreement" between Fundamental Administrative and Vida reflected that Fundamental Administrative, as "contractor" was engaged by Vida "to provide and perform certain support services required in connection with the management of the [f]acility and the [b]usiness." Likewise, the "Clinical Support Agreement" between Fundamental Clinical and Vida reflected that Fundamental Clinical as "contractor" was engaged by Vida "to provide and perform certain clinical support services required in connection with the management of the [f]acility and the [b]usiness." The sections of the support agreements that Plaintiff provided omitted any details regarding the specific services that Fundamental Defendants would provide to Vida, and they omitted any information regarding the cost of or payment for the administrative and clinical services. Although Ms. Inoue's deposition provided some insight into the services provided by Fundamental Defendants to Vida, her testimony, which we do not recite here, did not demonstrate the existence of genuine issues of material fact as to the elements of a joint venture agreement among the four Defendants themselves or the four Defendants and Vida.

{55} Plaintiff also presented the district court with an "Amended and Restated Limited Liability Company Agreement" between THI New Mexico and Vida (the

43

LLC agreement).  The LLC agreement stated, in relevant part, that THI New Mexico made an initial capital contribution of $100 to Vida and that it had a 100% membership interest in Vida.  It also stated that Vida's profits and losses "shall be allocated to" THI New Mexico.  It further stated that THI New Mexico had the authority to designate Vida's officers including, among others, its president, secretary, and  treasurer, that the officers' terms would be determined by THI New Mexico, and that the officers' powers and duties would be determined by THI New Mexico.  The treasurer's duties included having "custody" of Vida's funds, depositing "all moneys and other valuable effects in the name and to the credit of [Vida] in such depositories as may be designated by" THI New Mexico, and disbursing Vida's funds as ordered by THI New Mexico.  THI New Mexico had authority to remove any officer of Vida "at any time, with or without cause[.]"

{56}     On the basis of the foregoing evidence, even viewing that evidence, as we must, in the light most favorable to Plaintiff, we see no factual basis from which a fact-finder could conclude that the four Defendants among themselves or among themselves and with Vida intended to operate Vida as a joint venture.  Furthermore, Plaintiff's evidentiary presentation fails to show or even to create a slight doubt as to whether Defendants agreed among themselves, or as to whether the four together agreed with Vida to combine their money, property, or time to share profits and losses

44

of Vida's operation, or that they retained a right of mutual control over Vida. *See Quirico*, 1987-NMSC-070, ¶ 9 (stating the elements of a joint venture).

**{57}** These deficiencies in Plaintiff's evidence as to joint venture do not, however, end our analysis. A viable question exists whether Plaintiff's failure of proof was attributable to the court's discovery rulings. Had Plaintiff been permitted to take the Rule 1-030(B)(6) depositions and to have pursued her production requests, she may have discovered facts that showed the existence of a joint venture agreement.

**{58}** Thus, based on our holding that the court erred in denying Plaintiff's discovery requests and striking Mr. Engstrom's testimony, we reverse the court's summary judgment in favor of Defendants as to joint venture. The court abused its discretion by denying Plaintiff the opportunity to discover facts that might support her claim, including providing facts for her expert to illuminate the nature of the financial relationships among Defendants, and by then granting summary judgment based, we assume, on the deficiencies in Plaintiff's facts. *See Marchiondo*, 1982-NMSC-076, ¶ 22 (holding that the district court erred by granting summary judgment against a party that had been denied discovery of facts essential to its claim).

## C.    **Plaintiff's Direct Liability Claims**

**{59}** Plaintiff's complaint and all of her responses to Defendants' motions for summary judgment sounded essentially, if not exclusively, in joint venture. Plaintiff's

45

direct liability arguments on appeal discuss Defendants operating as a joint venture, collectively controlling Vida. Nevertheless, Plaintiff's negligence claim might be read to assert that each Defendant was individually responsible. We note for example, that Plaintiff's complaint stated that "[t]he acts and omissions of Defendants, and . . . each of them, individually . . . were wrongful and negligent and were the proximate cause of [the decedent's] death." The district court granted summary judgment in favor of Defendants individually as well as on Plaintiff's joint venture claim, and we conclude that those summary judgment proceedings disposed of any direct liability claims.

{60} The viability of Plaintiff's direct liability claims against each Defendant depends on whether Defendants, individually, owed a duty of care to the decedent, and if so whether a breach of that duty proximately caused the decedent's injuries. *See Moya v. Warren*, 1975-NMCA-150, ¶ 14, 88 N.M. 565, 544 P.2d 280 (stating that a party can be held liable for negligence only when that party owed a duty to the plaintiff and failed to observe the standard of care which the law requires in the performance of that duty). "Whether a duty exists is a question of law for the courts to decide." *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 6, 134 N.M. 43, 73 P.3d 181 (internal quotation marks and citation omitted). Our review is de novo. *See Valdez v. R-Way, LLC*, 2010-NMCA-068, ¶ 2, 148 N.M. 477, 237 P.3d 1289. On these legal questions, we look to the record to determine whether Plaintiff's evidence

46

demonstrated, as to each Defendant, the existence of facts that would preclude a ruling that as a matter of law no Defendant individually owed a duty to the decedent.

**1.    Duty Generally**

{61}    Whether a defendant owes a duty of care to the plaintiff depends on the nature of the activity in question, the parties' relationship to the activity, and public policy considerations. *Edward C. v. City of Albuquerque*, 2010-NMSC-043, ¶ 14, 148 N.M. 646, 241 P.3d 1086.  New Mexico has a strong public policy of preventing the abuse and neglect of nursing home residents, as evidenced by the Legislature's enactment of the Resident Abuse and Neglect Act, NMSA 1978, §§ 30-47-1 to -10 (1990, as amended through 2010).  *See* §§ 30-47-3 to -6 (criminalizing the abuse and neglect of residents of skilled nursing and intermediate care facilities, among others).  The relevant factual inquiry in this case is Defendants' relationship to the operation of Vida, necessarily focusing on their control of Vida's activities in relation to the decedent.

{62}    When one entity controls the activities of another entity to a point that the failures of the controlled entity can be attributed to the failures of the controlling entity, a duty of care will be imposed on the controlling entity. *See Smith ex rel. Smith v. Bryco Arms*, 2001-NMCA-090, ¶¶ 18, 25, 131 N.M. 87, 33 P.3d 638 ("The basic inquiry in [negligence] cases[, in which the issue is whether a duty exists,] is whether

the defendant has the ability to exercise control over [the] premise[s] or an activity such that it is reasonable to impose a duty of ordinary care on it as to the management of the premises or activities."). Therefore, in attempting to determine whether an alleged controlling entity owes a duty of care when that entity asserts on summary judgment that no such duty exists, the facts as to the nature and extent of control are critical.

{63}  The question—how much control must exist in order to rule as a matter of law that the alleged controlling entity has a duty of care—is not answered by applying a bright-line test. In this case, the level-of-control inquiry is most aptly guided by the same inquiry we would make relative to a parent company's duty of care to third parties for the tortious acts of its subsidiary. Accordingly, we turn to the principles applicable to determining the level of control that give rise to a duty of care of a parent company for the acts of its subsidiary that will guide our analysis in this case.[5]

{64}  Because no New Mexico case law exists on this direct liability theory of recovery, we look outside New Mexico. In *Forsythe v. Clark USA, Inc.*, the Illinois Supreme Court considered "whether a parent company can be held liable under a theory of direct participant liability for controlling its subsidiary's budget in a way

---

[5] Plaintiff did not plead or argue corporate veil piercing or single enterprise theories.

48

that led to a workplace accident[.]" 864 N.E.2d 227, 230 (Ill. 2007). The *Forsythe* court surveyed the field of law related to third-party direct liability claims against parent companies for the tortious acts of their subsidiaries. *Id.* at 232-37. From the *Forsythe* court's discussion, we distill the following principles that are useful in the context of analyzing Defendants' duties in this case. First, we must be mindful of the distinction between the control that a parent company naturally has over its subsidiary by virtue of the parent-subsidiary relationship, and a parent company's exertion of control over its subsidiary that exceeds the bounds of normalcy such that would be considered "eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* at 234 (internal quotation marks and citation omitted). A "normal" level of control associated with a parent-subsidiary relationship is marked by the parent company's ability to control its subsidiary by election of "desired directors and officers of the subsidiary" and by some degree of control and/or management by the parent of the subsidiary's budget. *Id.* at 233, 237 (internal quotation marks and citation omitted). An excessive amount of control that gives rise to a duty is marked by the parent's "direct intervention or intermeddling . . . in the affairs of the subsidiary[,]" by "command[ing] rather than merely cajol[ing]" the subsidiary's officers, and by the parent's mandate of "an overall business and budgetary strategy [combined with its] carry[ing] that strategy out by its own specific direction or

49

authorization, . . . in disregard for the interests of the subsidiary[.]" *Id.* at 233-34, 237 (internal quotation marks and citations omitted). With these principles in mind, we turn to the parties' summary judgment arguments and evidence.

**2.     Duty Related to THI Defendants**

{65}     The facts relevant to the question of THI Defendants' duty are the same as those related earlier in this Opinion in regard to the joint venture question. Accordingly, we do not fully re-state them here. The crux of THI Defendants' argument that they owed no duty of care to the decedent is that they did not own, operate, or control Vida and that they had no contact with the decedent or Plaintiff. We do not conclude THI Defendants' facts or argument support summary judgment. We reason that Plaintiff's evidence raised sufficient issues of material fact to require further factual development in further proceedings on the issue of a duty of care owed to the decedent by THI Defendants. At this stage, we are not prepared to say that, as a matter of law, no duty of care can be established through deeper investigation and proof as to the level of involvement in and control of Vida's operation by THI Baltimore and THI New Mexico.

{66}     Plaintiff contended that "[t]he ultimate issue in this case is whether [the decedent's] untimely death was the foreseeable result of profit-driven management and operational practices—practices implemented and controlled at the corporate

50

level—that were consistently at odds with resident needs." Plaintiff's evidence, including the credit and security agreement and the LLC agreement suggests that THI Baltimore and THI New Mexico had at least some involvement—the degree of which is, as yet, unknown—in the financial affairs of Vida. At the same time, THI New Mexico was able to hire, fire, and direct Vida's treasurer, and it retained the power to direct Vida's deposits and disbursements of money and valuables. Although these documents, as yet unexplained, incomplete, and standing alone, do not prove that THI Baltimore or THI New Mexico exerted an "excessive" amount of control over Vida, we believe that they raise at least a slight doubt as to the propriety of a determination that, as a matter of law, under the slightest doubt standard for summary judgment, those entities did not exert a level of control over Vida that would give rise to a duty of care owed to the decedent.

{67} Only with further discovery and factual development can the district court make an informed legal conclusion on the question of duty. We therefore reverse the court's summary judgment as to direct liability in favor of THI Defendants and remand for further factual development at trial. *See WXI/Z Sw. Malls v. Mueller*, 2005-NMCA-046, ¶ 8, 137 N.M. 343, 110 P.3d 1080 ("Summary judgment is not appropriate when the facts before the court are insufficiently developed or where further factual resolution is essential for determination of the central legal issues involved."

51

(alteration, internal quotation marks, and citation omitted)).  On remand, the district court's analysis of the question of duty should be guided by our discussion of the principles set out in *Forsythe*.

**3.      Duty Related to Fundamental Defendants**

{68}      Fundamental Defendants provided administrative, accounting, legal, and consulting services to Vida pursuant to written contracts.  In their joint motion for summary judgment, Fundamental Defendants argued, primarily, that in their capacity as legal and administrative consultants to Vida they owed no legal duty of care to the decedent and that Plaintiff had not, and could not, demonstrate a relationship between them and the decedent that would serve to establish such a duty.

**a.      Fundamental Defendants' Evidence Refuting Direct Liability**

{69}      In support of their absence-of-duty argument, Fundamental Defendants attached to their motion for summary judgment the affidavit of their in-house counsel, Ms. Zack.  In pertinent part, Ms. Zack stated that Fundamental Defendants did not serve "on the governing body of [Vida] or otherwise [act] in any capacity to operate, manage[,] or control [Vida]."  She also stated that Fundamental Defendants provided services to Vida pursuant to written contracts, but that they "never operated, managed[,] or controlled" Vida, and they did not have the authority to do so.  Ms. Zack further stated that Fundamental Defendants "never . . . had an ownership interest

52

in [Vida]" and that there was "no evidence that [they] committed any act or were responsible for any omission that proximately caused harm to [the decedent]."

**b.    Plaintiff's Evidence Demonstrating Direct Liability**

{70}    In response to Fundamental Defendants' motion for summary judgment, Plaintiff presented the deposition testimony of Ms. Inoue and copies of the support agreements between Fundamental Administrative and Vida, and Fundamental Clinical and Vida.

{71}    According to their respective support agreements with Vida, Fundamental Defendants were authorized to perform their contracted-for services "in whatever manner [they] deem[ed] reasonably appropriate to meet the day-to-day requirements of the operations of Vida[.]"

{72}    Ms. Inoue testified that when she became Vida's administrator, she was trained by Fundamental Defendants at a campus that housed "some of the Fundamental offices." Regarding the budget, Ms. Inoue testified that she, along with an accountant from Fundamental[6] and Fundamental's regional vice president, Daniel Mathis, worked on the budget together over the course of two or three teleconferences. According to

---

[6]    Ms. Inoue did not distinguish between Fundamental Administrative and Fundamental Clinical. As such, in reciting her testimony, we refer generally to "Fundamental."

Ms. Inoue, she told Mr. Mathis and the accountant what she wanted and needed, but that the accountant and Mr. Mathis "did the calculations" and finalized the budget report.

{73} Additionally, Ms. Inoue testified that a Fundamental human resources consultant advised her regarding firing decisions and other human resources issues at Vida and that Fundamental participated in developing Vida's pay scale. Ms. Inoue also testified that Fundamental helped to create Vida's policies and procedures, including helping to keep Vida's policies and procedures current "with regulations and changes and that kind of thing." She also stated that Fundamental operated a toll free hotline that could be used by anyone, including family members of Vida's residents who were concerned about Vida's treatment of its residents. Hotline calls were fielded by Fundamental employees, who would contact Ms. Inoue and ask her to follow up on the report.

{74} Ms. Inoue further testified that Fundamental also provided Vida's employees with training through an online company called Silver Chair; Fundamental coordinated with Silver Chair to select the classes that would keep Vida employees "in compliance." And she testified that Fundamental coordinated the writing, printing, and shipping of "What You Need To Know" books for Vida's use that covered a variety of topics, including "abuse and neglect"; the same information was

also available to Vida electronically through Fundamental's website. Vida's administrator and the managers of Vida's various departments had copies of the "What You Need To Know" books, and according to Ms. Inoue, the books were used as a resource, but they did not constitute "mandatory things [that they] had to follow[.]"

{75} Ms. Inoue testified that "almost every single department manager had a [Fundamental] consultant that came to [Vida] at some time or another." This included "nurse consultants who [went] to [Vida] on a regular basis to help [Ms. Inoue] and the director of nursing." This included a business consultant, an accountant, and a manager consultant. It also included Mr. Mathis, Fundamental's regional vice president, who helped Ms. Inoue to ensure that Vida stayed in compliance with federal and state regulations and "everything that [Vida] had to follow."

{76} The consultants and Mr. Mathis completed "scorecards" that were developed by Fundamental "to help manage the different departments." Every department at Vida had a scorecard, and the scorecards were filled out regularly by the consultants so that Fundamental could track progress and performance. By these scorecards, the heads of Vida's departments would know "if they were doing okay or not."

{77} Ms. Inoue's testimony shows that Fundamental Defendants were directly involved in and perhaps substantially in charge of key aspects of Vida's operation,

55

including training, supervising, and assessing Vida's staff and administrator, promulgating Vida's guidelines, policies, and procedures, budgeting, ensuring Vida's compliance with regulations, and handling complaints regarding resident care and employee misconduct. The fact that Fundamental Defendants' actions were undertaken pursuant to contract should not, and in our view does not, foreclose a determination that Fundamental owed a duty of care to the decedent.

{78} As with other of Plaintiff's claims, further factual development is required before the district court may conclusively determine whether, as a matter of law, either or both of Fundamental Defendants owed the decedent a duty of care. Among other things, for example, Ms. Inoue's testimony regarding Fundamental Defendants' involvement in Vida's operation will likely need to be supplemented with facts that show which "Fundamental" Defendant provided what services. Under the circumstances of this case, particularly the "membership" relationships connecting Defendants to a common owner, the court should evaluate the adjudicated or undisputed facts of control giving rise to a duty of Fundamental Defendants under the same standards applicable to a parent and subsidiary company.

{79} Fundamental Defendants' argument and authority, attempting to refute the existence of a duty of care by urging the notion that they were mere independent contractors, with no relationship to the decedent, and whose advice Vida's

56

administrators and staff could take or leave, is unavailing in the context of this case at its present summary judgment stage. Equally unpersuasive is Fundamental Defendants' policy-based argument that "imposing a legal duty of care on [Fundamental Defendants] under the circumstances of this case would represent an unprecedented and improvident expansion of liability for independent contractors" that would, in theory, permit "a company that supplies food to a nursing home [to be held] liable for a resident's food-related illness when the facility's cafeteria fails to properly prepare the meal." Plaintiff presented facts sufficiently indicating rather that Fundamental Defendants' contractual relationships, in practice, constituted an independent implementation and oversight of Vida's infrastructure, while simultaneously attempting to avoid liability. *Cf. Diaz v. Feil*, 1994-NMCA-108, ¶ 13, 118 N.M. 385, 881 P.2d 745 (stating that "in New Mexico . . . a hospital owes an independent duty of care to patients at the hospital"); *Cooper v. Curry*, 1978-NMCA-104, ¶¶ 43, 55, 92 N.M. 417, 589 P.2d 201 (Sutin, J., dissenting) (stating that a hospital has "a profound interest in maintaining high standards of medical care in protecting the health and lives of it[s] patients[,]" a hospital has "a duty to review the quality of patient care and provide safeguards to insure that its staff, agents[,] and servants perform their duties with reasonable care[,]" and further that "[t]he distinction between independent contractor and agent does not realistically reflect the

symbiotic relationship between a hospital and its medical staff" and "this distinction is a distinction without a difference").

**4.     Summary—Direct Liability**

{80}     In sum, further factual development is necessary before the district court may conclude whether, as a matter of law, Defendants owed the decedent a duty of care. On remand, Plaintiff shall have the opportunity through appropriate discovery to learn the extent to which Defendants controlled Vida's operation.  After factual analyses and determinations by the appropriate trier of fact, the court shall determine whether, as a matter of law, Defendants controlled Vida's operation to a degree that would give rise to a duty of care to the decedent.

**CONCLUSION**

{81}     As should be evident from our Opinion, we hold that Plaintiff squeaks through the adverse summary judgments, based on the court's erroneous denial of Plaintiff's discovery under the particular circumstances of this case and based heavily on our summary judgment standards and rules that strongly favor trials on the merits.  The company structure and relationships set up by Fundamental Long-Term Care Holdings, LLC and its owners may well have a bona fide economic justification and have no purpose of attempting to limit damages recovery from nursing home negligence causing harm to residents.  A victim of nursing home negligence should

58

have the opportunity to show that the structure and relationships either were intended to or had the effect of limiting damages recovery. Although there exists some question whether Plaintiff earned the chance to survive summary judgment here, we believe that the best result is to get the case back on the road to trial.

{82} We reverse the district court's orders denying Plaintiff's motions to compel discovery, depositions of individuals, and Rule 1-030(B)(6) depositions. We also reverse the court's order excluding Plaintiff's expert, Mr. Engstrom, and his testimony. All discovery issues are left to the sound discretion of the court on remand. In light of our discovery rulings, and based on our summary judgment standards, as set out and explained in this Opinion, we reverse the district court's summary judgments in favor of Defendants.

{83} **IT IS SO ORDERED.**


_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**


_____
**JAMES J. WECHSLER, Judge**


_____

59

**MICHAEL D. BUSTAMANTE, Judge**